*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
:
JEFFREY R. MURPHY,            :
                             :
      Plaintiff,          :
                             :     Civ. Action No.: 14-cv-6896 (FLW) (DEA)
v.                      :
                             :        **OPINION**
MICHAEL W. PALMER, JR., RYAN  :
REIFF, EMMETT SMITH, DAVID   :
BOWEN, "OFFICERS DOES 1-20," and :
BOROUGH OF SPRING LAKE    :
POLICE DEPARTMENT,       :
                             :
      Defendants.      :
_____:

**WOLFSON, United States District Judge:**

In this case, plaintiff Jeffery R. Murphy ("Plaintiff") asserts that he was unlawfully arrested and subjected to excessive force by defendants Michael W. Palmer, Jr. ("Officer Palmer"), Ryan Reiff ("Officer Reiff"), Emmett Smith ("Officer Smith"), David Bowen ("Officer Bowen") (collectively, the "Officers") and the Borough of Spring Lake Police Department (the "Department") (collectively, "Defendants") in violation of his constitutional rights, as well as various state claims under New Jersey law. Presently before the Court is a motion for summary judgment filed by the Department and Officer Palmer, as well as a separate motion for summary judgment filed by Officers Reiff, Smith and Bowen. Additionally, Plaintiff has filed a cross-motion for partial summary judgment.

For the reasons set forth below, Defendants' respective motions for summary judgment are **GRANTED**, and the First Count (excessive force), Second Count (unreasonable arrest and detention) and Third Court (conspiracy to violate Plaintiff's constitutional rights) are dismissed

as to all Defendants. Plaintiff's cross-motion for partial summary judgment is **DENIED**.

Finally, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state

law claims. Thus, those claims are dismissed without prejudice and the applicable statutes of

limitations are tolled; Plaintiff may refile his state law claims in State court within thirty (30)

days from the date of the Order accompanying this Opinion. See 28 U.S.C.S. § 1367(c)-(d).

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On October 27, 2012, Governor Chris Christie declared a State of Emergency in New

Jersey, since Hurricane Sandy (also referred to as "Superstorm Sandy") was expected to make

landfall the following day. See Declaration of Jeffrey R. Murphy ("Murphy Decl."), Ex. O,

Executive Order No. 104. After the storm made landfall, the Borough of Spring Lake ("Spring

Lake" or the "Borough") promulgated several emergency proclamations imposing a curfew and

various travel restrictions. See Declaration of Andrew T. Walsh, Esq. ("Walsh Decl."), Ex. C,

Spring Lake Emergency Proclamations. Relevant here, on October 30, 2012, the Borough issued

an emergency proclamation that declared that the "[e]ntire town [was] closed to anyone except

residents," and established a checkpoint where "[e]ntry [to the Borough was] only open at

Warrant & Ludlow Avenues."[1] Id. That proclamation imposed such restrictions "by reason of

the conditions which currently exists [sic] in certain areas of the Borough of Spring Lake, which

may affect the health, safety and welfare of the people of the Borough of Spring Lake." Id. In

addition, the proclamation stated that "certain measures must be taken in order to insure that the

authorities will be unhampered in their efforts to maintain law and order[,] as well as maintain an

---

[1] All emergency proclamations were signed by James Mullen, the Borough's Emergency
Management Coordinator, and Jennifer Naughton, the Mayor. Id.

orderly flow of traffic, and further in order to protect the persons and property of the residents affected by the conditions" caused by Hurricane Sandy.  Id.

At the checkpoint, Spring Lake police officers required any person attempting to enter the Borough to produce identification, so an officer could verify residence.  Walsh Decl., Ex. E, Deposition of Michael W. Palmer, Jr. ("Palmer Dep.") at 33:17-34:1.  Officer Palmer, who was working on the night Plaintiff was arrested, stated that, "[i]f your driver's license didn't indicate that you lived there, an out-of-state license, something like that, and you had a sewer bill, water bill, tax bill that had your name and address in Spring Lake on it, then we would allow you to go through."  Id.  Officer Palmer explained that the checkpoint was setup because of health and safety concerns, including "debris on the ground, the boardwalk was completely dismantled... [and] sand [was] everywhere."  Id. at 32:25-33:6.  The officer also stated that "there was talk about people looting in surrounding towns," and that the Department "wanted to keep... [that] out of our town as much as we could."  Id.

It is undisputed that, at all relevant times, Plaintiff was not a resident of Spring Lake, and that he lived at 372 West Farms Road, Farmingdale, New Jersey – the address listed on his driver's license.  Walsh Decl., Ex. D, Deposition of Jeffrey R. Murphy ("Murphy Dep.") at 7:13-20, 40:3-5.  However, Plaintiff explained that his father lived at 415 Essex Avenue, Spring Lake, New Jersey.  Id. at 29:23-30:19.  Although his permanent residence was in Farmingdale, Plaintiff maintained an apartment at his father's house, and he "spent a lot of time there."  Id.  Plaintiff testified that, during Hurricane Sandy, he stayed with his father in Spring Lake, and that he was responsible for making "sure that [they] had provisions and gasoline" for the generator, since the Borough experienced significant electrical power outages.  Id. at 34:17-35:17.  Because he had to

travel to other municipalities to procure provisions, Plaintiff stated that he went through the checkpoint at issue on approximately 18 to 21 occasions. Id. at 38:1-7.

Plaintiff testified that, each time he arrived at the checkpoint, a police officer would ask for identification, such as a driver's license, and Plaintiff would explain that he was staying at his father's residence in Spring Lake. Id. at 38:25-40:24. According to Plaintiff, "it was hit or miss depending on [which officer] was [at the checkpoint]," because the process would "go smooth" with some officers, but other officers would "put [you] through your paces." Id. at 56:18-22. For instance, Plaintiff stated that his brother experienced trouble entering the Borough because "[h]e's got the Ocean Grove address and [the officer] did not allow him in." Id. at 49:1-17. Plaintiff explained that his brother decided to "park[] down by the train station... and [that he] went across the tracks and walked home." Id. Plaintiff stated that his brother was "furious." Id.

On November 4, 2012, because the electrical power had not been restored in Spring Lake, Plaintiff decided to go to the Shark Anglers Fishing Club in Brick Township, New Jersey with his friend to watch a football game. Id. at 44:21-24, 48:4-11, 51:23-24. Plaintiff testified that, while he was at the bar, he had "[f]our Heineken beers," and that he left the bar at "about eight." Id. at 53:16-54:9. Plaintiff called a cab to bring him back to his father's house. Id. at 55:1-21. John Streppone, a cab driver for Briggs Transportation, stated that he drove Plaintiff from Brick Township to Spring Lake. Walsh Decl., Ex. F, Deposition of John Streppone ("Streppone Dep.") at 10:9-15, 13:5-23.

Upon arriving at the checkpoint, Sergeant Ploskonka ("Sgt. Ploskonka"), a police officer with the Department, asked both the cab driver and Plaintiff to produce identification, and they complied. Murphy Dep. at 56:13-22; see Streppone Dep. at 23:13-23; Palmer Dep. at 13:10-11. Streppone recalled that Sgt. Ploskonka questioned Plaintiff about his driver's license because

"there was some type of discrepancy [and] the address on the license was different from the one that [they] were going to."  Streppone Dep. at 23:13-23.  However, Streppone stated that Sgt. Ploskonka "handed [Plaintiff] his license and said [they] could go and started walking away, [but] the passenger mumbled something that got the officer's attention."  Id. at 25:1-8.  Plaintiff testified that he "just made a suggestion that it would be nice if [the Department] could set up some kind of registry," presumably to catalog persons that were permitted to enter the Borough.  Murphy Dep. at 56:18-22.

Based on his comments, Sgt. Ploskonka walked back to the cab and Plaintiff and the officer continued their conversation.  Streppone Dep. at 34:12-17.  While the content of the conversation is not in the record, Streppone testified that "the officer... acted professionally."  Id. at 34:18-20.  Plaintiff explained that "it may have appeared that [he raised his voice to the officer] because [he] was sitting across from [Streppone], so [he] had to talk kind of loud."  Murphy Dep. at 59:6-11.  Plaintiff clarified that he "wasn't being nasty about anything."  Id. Ultimately, Sgt. Ploskonka permitted Streppone and Plaintiff to pass the checkpoint and enter the Borough.  Id. at 61:4-11.

On November 4, 2012, Officer Palmer was assisting Sgt. Ploskonka at the checkpoint.[2] Specifically, Officer Palmer testified that, at "approximately eight o'clock at night," he checked on Sgt. Ploskonka to ask "if he needed anything; coffee, use the bathroom, anything."  Palmer Dep. at 13:1-11.  Officer Palmer testified that, while walking to Sgt. Ploskonka, he heard a

---

[2] In his brief, Plaintiff states that, while he "maintains that the majority of Defendant Palmer's 'version' of the facts… are a fabrication and lie concocted to cover up and mitigate the illegal and unjustified and excessive assault on Plaintiff, for the purposes of this motion[,] Plaintiff will nevertheless rely upon Defendant Palmer's version of the facts…."  Pl.'s Br. in Supp. of Cross-Motion at p. 12.

verbal altercation between Plaintiff and his fellow officer.  Id. at 13:1-14:6.  According to Officer

Palmer, when the cab left the checkpoint, Sgt. Ploskonka instructed him to follow the cab "to just

check and make sure that is where [Plaintiff] was supposed to be."  Id.  Officer Palmer explained

that he followed Plaintiff to ensure that "[h]e wasn't going to get out of the cab, walk to another

house, walk into a backyard, try to steal something, try to burglarize a house."  Id.

Officer Palmer then "proceeded to follow behind the cab on to Essex Avenue."  Id.

Streppone testified that, while he was driving, he "noticed an unmarked police car following

[them] with the lights flashing."[3]  Streppone Dep. at 36:11-13.  Similarly, Plaintiff noticed that a

police vehicle had followed him back to his father's residence.  Murphy Dep. at 61:4-11.

Streppone stated that, "[w]hen [Plaintiff] found out that there was a police officer following

[them], he got a little angry about that."  Streppone Dep. at 40:1-4.  Approximately two minutes

after they left the checkpoint, both the cab and Officer Palmer arrived at 415 Essex Avenue.

Palmer Dep. at 14:7-18; see Streppone Dep. at 62:11-19.  Officer Palmer proceeded to park his

patrol vehicle behind the cab on the street.  Palmer Dep. at 17:19-24; see Murphy Dep. at 62:3-

11; Streppone Dep. at 39:11-20.

Plaintiff testified that he paid Streppone for the ride, and that he exited the vehicle after

about "[a] minute and a half."  Murphy Dep. at 62:15-24; see Palmer Dep. at 36:7-9.  According

to Officer Palmer, Plaintiff exited the cab and started walking "toward the side of the driveway."

Palmer Dep. at 37:1-4; see Murphy Dep. at 127:10-23.  Officer Palmer explained that "[he]

became suspicious and [] got out and asked [Plaintiff] what is going on," but Plaintiff started

yelling, "[f]uck you, fuck you.  You're harassing me.  This is bullshit."  Palmer at 14:7-18; see

---

[3] Palmer testified that he had his lights on because the Department issued "a standing order that
our emergency lights had to be activated," and that he was not pulling over the cab in which
Plaintiff was riding.  Palmer Dep. at 35:10-19.

Streppone Dep. at 41:11:14.  Plaintiff admitted that he said "[f]uck you… [p]robably two or three times," as well as "bullshit."  Murphy Dep. at 63:3-67:6.  Officer Palmer testified that he told Plaintiff to "just go inside" on multiple occasions, but Plaintiff continued to yell obscenities at the officer.  Palmer Dep. at 37:25-38:9.  Streppone confirmed that Officer Palmer told Plaintiff to go inside, since it was late at night and Plaintiff was "yelling for no apparent reason." Streppone Dep. at 43:8-18, 45:22-46:2.  According to Streppone, Officer Palmer "was professional and spoke in an authoritative way," and that the officer told Plaintiff to go inside approximately five different times.  Id. at 44:23-45:2, 45:22-26:2.

Streppone stated that, approximately two or three minutes after Officer Palmer exited his vehicle, he asked Plaintiff for his identification.  Id. at 49:24-50:16.  Indeed, Officer Palmer testified that he provided Plaintiff "a couple of minutes [to] let him vent," but he proceeded to walk up the driveway to request Plaintiff's identification in order to issue him a breach of peace violation.  Palmer Dep. at 14:7-15:5.  Officer Palmer testified that he decided to charge Plaintiff with breach of peace based on "[h]is demeanor, his yelling and screaming [and] cursing" in front of Streppone, which he believed was "enough under our ordinance... to issue a summons for breach of peace."  Id. at 19:18-25.

Officer Palmer testified that Plaintiff refused to provide his identification, and that he continued to yell obscenities and "point[] his fingers in [the officer's] face."  Id. at 14:7-15:5. Officer Palmer decided to arrest Plaintiff for obstruction of justice because:

> [w]hen I asked him for his driver's license to issue him the breach of peace, "the fuck you, no, I am not giving it to you," falls under obstruction [of justice].  That is when I advised [Plaintiff] that if he didn't give it to me, and I gave him numerous time for him to give me his driver's license, so that I [could] issue the summons and we both could move on with our nights.  He decided not to and [he] proceeded [not to give me] his driver's license and that was my ultimate – my ultimate decision to lock him up was for [] obstruction [of justice]….

Id. at 21:10-25.  In addition to refusing to provide his identification, Officer Palmer testified that Plaintiff started to walk up the driveway to the back of his father's residence, where it was completely dark because of the power outages.  Id. at 15:6-16, 70:6-12.

Officer Palmer stated, at that time, his "backup arrive[d]," namely Officers Reiff, Smith and Bowen.  Id. at 15:6-16.  Officers Reiff and Smith were out on patrol together, when Officer Palmer requested assistance.  See Walsh Decl., Ex. H, Deposition of Ryan Reiff ("Reiff Dep.") at 17:1-8.  Officer Reiff testified that, when they arrived, Plaintiff and Officer Palmer "were on the side of the residence and [Plaintiff] kept walking toward the back of the residence."  Id. at 16:25-17; see Walsh Decl., Ex. J, Deposition of Emmett Smith ("Smith Dep.") at 8:1-13.  Officer Bowen testified that he was the only officer in his police vehicle, and that he heard "Palmer requesting back-up over the radio."  Walsh Decl., Ex. I, Deposition of David Bowen ("Bowen Dep.") at 6:17-7:16.  After arriving at the scene, Officer Bowen stated that he witnessed Officer Palmer following Plaintiff as he "walk[ed] down the driveway into the rear of the residence." Id. at 8:8:11.  Officers Reiff, Smith and Bowen stated that they heard Plaintiff screaming obscenities, as well as refusing to provide his driver's license to Officer Palmer.  See Reiff Dep. at 17:9-18:1; Smith Dep. at 9:10-10:1; Bowen Dep. at 8:1-9:2.  Those officer proceeded to follow Plaintiff and Officer Palmer to the back of the residence.  Plaintiff testified that he walked down the driveway to the back of the residence, and made a left and walked "down three steps to the back door."  Murphy Dep. at 68:22-69:13.

While at the back door, Officer Palmer allegedly told Plaintiff that he was under arrest, and instructed him to place his hands behind his back, but Plaintiff "tried to get into the house." Palmer Dep. at 15:6-16.  Plaintiff stated that he heard Officer Palmer "mention that he was going to place [him] under arrest" before he attempted to enter the residence.  Murphy Dep. at 71:18-

21.  Nevertheless, Plaintiff testified that he proceeded to "open[] the [glass] storm door to gain entrance… into the kitchen and Officer Palmer was to my right and he pushed the door shut on me."  Id. at 70:13-16.  Officer Palmer acknowledged that, when Plaintiff attempted to enter the residence, he closed the door.  Palmer Dep. at 15:6-16.  Officer Bowen similarly stated that "[Officer] Palmer told [Plaintiff] that he was going to be placed under arrest," but Plaintiff "tried to open the back door" and Officer Palmer "just held the door closed."  Bowen Dep. at 8:18-9:2.  Officer Palmer, again, asked Plaintiff for his identification, but he repeatedly screamed "fuck you" and "put his finger in [the officer's] face."  Palmer Dep. at 15:6-16; see Smith Dep. at 11:7-17.  Officer Reiff stated that Plaintiff was shouting obscenities and shoving his finger into Officer Palmer's face, and that the officer instructed Plaintiff to stop, but he continued to put his finger in the officer's face.  Reiff Dep. at 18:2-18.

At that point, the Officers proceeded to effectuate the arrest.  Palmer Dep. at 15:6-16:4; see Reiff Dep. at 18:2-18; Smith Dep. at 11:7-17; Bowen Dep. at 9:17-10:3.  According to Plaintiff, "no sooner was [the door] shut closed on [him] when the ambush began."  Murphy Dep. at 72:10-12.  Plaintiff testified that he "was tackled to the ground."  Id. at 74:10-11.  Officer Palmer stated that "[the officers] took him to the ground."  Palmer Dep. at 15:6-16:4.  Officer Palmer explained that Plaintiff would not place his hands behind his back, so it was necessary to take Plaintiff to the ground to "gain control of him and try to arrest him, try to get handcuffs on him."  Id. at 22:12-20.  According to Officer Palmer, it was not difficult to take Plaintiff to the ground because he was intoxicated.[4]  Id. at 24:3-12.

---

[4] There is a dispute over whether Plaintiff was intoxicated on the night of his arrest.  Plaintiff states that he was not intoxicated.  See Murphy Dep. at 53:16-55:7.  John Streppone, the cab driver, noted that Plaintiff did not seem intoxicated, because he was coherent and "didn't seem to be slurring his speech."  Streppone Dep. at 17:10-19, 21:9-18.  However, Officer Palmer testified that Plaintiff was clearly intoxicated, and that he stumbled while walking.  Palmer Dep. at 37:1-

Nevertheless, while Plaintiff was on the ground, both Officers Palmer and Bowen stated that they tried to gain control of the left arm.  See id. at 25:3-9; Bowen Dep. at 10:1-14.  Officer Smith stated that he tried to gain control of the other arm, and Officer Reiff held down the legs.  See Smith Dep. at 12:2-7; Reiff Dep. at 22:4-6.  Officer Reiff testified that Plaintiff was "turtling," which means that he kept his hands underneath his body so the Officers "could not get his arms out to be placed in handcuffs."  Reiff Dep. at 23:10-15; see Palmer Dep. at 25:3-9.  Officer Smith similarly stated that Plaintiff "just kept resisting," and that he was "told to stop resisting and he just wouldn't free his arms from under his body in an attempt to avoid us from handcuffing him."  Smith Dep. at 12:17-22.

However, Plaintiff testified that, while Officer Palmer told him to stop resisting, he had landed on his hands, and that "[t]here was no resistance at all.  I was dazed.  I hit my head."  Murphy Dep. at 75:8-14, 78:2-5.  Plaintiff also stated that he could not get his hands out from under his body "[b]ecause there was somebody on [his] back."  Id. at 75:20-24.  Officer Palmer stated that is possible that he put his knee on his back.  Palmer Dep. at 25:20-25.  Plaintiff explained that, although he was only on the ground for approximately one minute, the Officers were "wrestling [him] around, they pulled my hair, kneed me in the back, got [his] hand out and they cuffed me."  Murphy Dep. at 77:7-14.  Plaintiff later clarified that one of the officers pulled both his hair and his collar while "helping [him] up."  Id. at 78:17-22, 80:2-6.

After Plaintiff was placed in handcuffs, he was escorted to a patrol vehicle.  Palmer Dep. at 15:6-16.  Plaintiff testified that "[the Officers] put him in the back of the police car," but

_____

4, 24:3-12.  Officer Reiff stated that he could "smell alcohol odor coming off of [Plaintiff], [and that his] eyes were very glassy and bloodshot."  Reiff Dep. at 19:13-18.  Nevertheless, that dispute is immaterial to analysis on the federal constitutional claims.

"[t]here was minimal amount of room between the back of the front seat and the lower cushion on the back seat; less than a foot."  Murphy Dep. at 81:14-22.  Plaintiff continued, "I have pretty long legs," but "[the Officers] were trying to squeeze me in there."  Id.  Plaintiff claims that, while he was being placed in the patrol vehicle, one or more of the Officers "shut the door and [his] knee got caught in the jamb."  Id. at 81:23-82:10.  Plaintiff stated that, as a result of the door hitting his knee, he "let out a scream," and then the Officers "gave [him] a little more time to get situated."  Id. at 83:7-11.

Officer Palmer noticed that Plaintiff had blood on his nose, so the officer called an ambulance, but Plaintiff decided not to go to the hospital.  Palmer Dep. at 15:17-16:4; see Murphy Dep. at 86:11-15.  Plaintiff stated that he thinks his bloody nose was caused when he was placed on the ground, but he experienced "no serious pain."  Murphy Dep. at 86:18-85:14.  Plaintiff was then transported to the Department, where he was booked and processed.  Palmer Dep. at 15:17-16:4.  While he was at the police station, Plaintiff stated that he experienced chest pains.  Murphy Dep. at 88:16-89:23.  Officer Palmer called an ambulance, and Plaintiff was taken to the Jersey Shore Medical Center.  Palmer Dep. at 15:17-16:4.  After being released from the hospital, Plaintiff did not go back to the police station, but rather, "[his] dad came and got [him]."  Murphey Dep. at 94:17-21.  After the incident, two summons were issued: (i) a disorderly conduct charge under N.J.S.A. § 2C:33-2(a)(2); and (ii) an obstruction of justice charge under N.J.S.A. § 2C:29-1(a).  See Walsh Decl., Ex. G, Criminal Citations.  However, the

parties do not dispute that those charges were ultimately dismissed, since the State apparently failed to timely proceed within the applicable statute of limitations.[5]  Murphy Dep. at 104:6-23.

On November 3, 2014, Plaintiff filed his Complaint, asserting the following claims against Defendants: (i) First Count – an excessive force claim under the Fourth Amendment; (ii) Second Count – an unreasonable arrest and detention claim under the Fourth and Fourteenth Amendments; (iii) Third Count – conspiracy to violate Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments; (iv) Fourth Count – malicious prosecution under New Jersey common law; (v) Fifth Count – false imprisonment under New Jersey common law; (iv) Sixth Count – assault and battery under New Jersey common law; and (vii) Seventh Count – negligence under New Jersey common law.  In connection with the federal constitutional claims, it appears that Plaintiff also asserts municipal liability claims, pursuant to Monell v. New York City Dep't of Social Servs., 436 U.S. 658 (1978), against the Department for unconstitutional policies or customs.

On October 5, 2016, the Department and Officer Palmer filed a motion for summary judgment and, on the following day, the remaining Officers filed a separate motion for summary judgment.  Later that month, on October 24, 2016, Plaintiff filed a cross-motion for partial summary judgment on the Second Count (unreasonable arrest and detention claim) and the Fourth Count (malicious prosecution), as well as a "Cross-Motion to Dismiss Defendants' Motions for Summary Judgment" because Defendants failed to comply with the procedural Rules, including filing a statement of undisputed material facts as part of their respective moving

---

[5] It appears that Plaintiff filed an Internal Affairs complaint against the Officers, but the Monmouth County Prosecutor's Office (the "MCPO") subsequently dismissed the complaint on September 23, 2013.  Murphy Decl., Exs. D and E.  In addition, Plaintiff filed a criminal complaint against each of the Officers, asserting claims of official misconduct.  Id. at Ex. F. However, those claims were later dismissed, as well.  Id. at G and K.

briefs.  Plaintiff refused to substantively address Defendants' motions until they complied with the Rules.

On November 2, 2016, the Department and Officer Palmer filed a response to the cross-motion to dismiss its motion for summary judgment on procedural grounds, and they also filed an opposition to the cross-motion for partial summary judgment.  The following day, the remaining Officers adopted and incorporated by reference the responsive brief filed by the Department and Officer Palmer.  On November 29, 2016, this Court denied the cross-motion to dismiss Defendants' motions for summary judgment, and directed Plaintiff to file his substantive opposition to Defendants' motions, including responses to Defendants' statements of undisputed facts, on or before December 9, 2016.  However, the Court specifically reserved judgment on the merits of the cross-motion for partial summary judgment.

On December 9, 2016, Plaintiff filed his opposition to Defendants' motions and response to the statement of undisputed material facts.  On December 28, 2016, Officers Reiff, Smith and Bowen filed a reply in opposition to Plaintiff's cross-motion for partial summary judgment.  The following day, the Department and Officer Palmer adopted and incorporated by reference the responsive brief filed by the other defendants.

## II.     LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law."

Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Anderson, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." Id. at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." Id. Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324; see also Matsushita, 475 U.S. at 586; Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to

evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323; see Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992).

## III. DISCUSSION

### a. Qualified Immunity

Defendants argue that the Officers are entitled to the protections of qualified immunity in connection with Plaintiff's claims for excessive force, unreasonable arrest and detention and conspiracy to violate Plaintiff's constitutional rights. "Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." Santini v. Fuentes, 795 F.3d 410, 416-17 (3d Cir. 2015) (internal quotation marks and citation omitted). Qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal quotation marks omitted); see Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (stating that the qualified immunity standard is one of "objective legal reasonableness."); Carswell v. Borough of Homestead, 381 F.3d 235, 242-43 (3d Cir. 2004) (stating that "qualified immunity is an objective question to be decided by the court as a matter

of law.").  This protection exists "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted); see Malley v. Briggs, 475 U.S. 335, 341 (1986) (stating that qualified immunity "protects all but the plainly incompetent").

In deciding whether a police officer is entitled to qualified immunity, a court examines: (i) whether the facts alleged make out a violation of a constitutional right; and (ii) if so, whether the right at issue was clearly established at the time of the defendant's alleged misconduct.  See Pearson, 555 U.S. at 232; see also Kelly v. Borough of Carlisle, 544 Fed. Appx. 129, 133-34 (3d Cir. 2013).  In order to be clearly established, a right must be sufficiently clear that a reasonable police officer would have known that his or her conduct was unlawful.  Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012); see Coles v. Carlini, 162 F. Supp. 3d 380, 399-400 (D.N.J. 2015).  However, courts are permitted to address either prong of the analysis first in light of the circumstances at hand.  See Pearson, 555 U.S. at 236.  Finally, the officer bears the burden to prove qualified immunity.  See Thomas v. Independence Twp., 463 F.3d 285, 292 (3d Cir. 2006); Hicks v. Feeney, 850 F.2d 152, 159 (3d Cir. 1988).

    1.    **The Checkpoint**

In opposition to Defendants' motions, and in support of his cross-motion, Plaintiff contends that Defendants violated his Fourth Amendment rights by requiring him to stop at the

checkpoint.[6]  Specifically, Plaintiff maintains that "Super-Storm Sandy resulted in a 'temporary State of Emergency,' not a 'temporary Police State….'"  Pl.'s Br. in Supp. of Cross-Motion at p. 8.  In response, Defendants argue that the checkpoint was reasonable, especially considering that the Governor declared a State of Emergency because of the storm, and that the Borough determined that the Department needed to protect the health, safety and welfare of the residents of Spring Lake.[7]  To be clear, Plaintiff was not arrested at the checkpoint, but rather, he was allowed to pass through the checkpoint, and was subsequently arrested for his actions after he arrived at his father's residence.  As such, this inquiry focuses solely on the stop that occurred at the checkpoint.

---

[6] The Court notes that it is unclear, from both the pleadings and the moving papers, against whom this claim is asserted.  Plaintiff has not named Sgt. Ploskonka, the officer who stopped Plaintiff at the checkpoint, as a named defendant, nor is there any evidence that Officers Reiff, Smith and Bowen participated in the checkpoint on the night of the arrest.  Thus, the only remaining defendants are Officer Palmer and the Department.  To the extent that Plaintiff asserts this particular claim against Officer Palmer, as discussed infra, the Court concludes that Officer Palmer is entitled to qualified immunity for his participation in the checkpoint, since the checkpoint was reasonable under the circumstances.  With respect to the municipal liability claims against the Department, as discussed infra, the Court holds that the Department is not a proper party, but rather, the Borough is the legal entity amenable to suit for claims concerning unconstitutional policies or customs.  Furthermore, assuming that it is a proper party, the Department cannot be held liable, because the Court has found that Officer Palmer did not violate any Plaintiff's constitutional rights.

[7] In response to that argument, Plaintiff argues that neither the New Jersey motor vehicle statutes, nor the Executive Order authorized the Borough and/or the Department to setup a checkpoint in the wake of Hurricane Sandy.  However, it appears that Plaintiff misconstrues Defendants' argument, which is simply that the checkpoint was reasonable because the Governor had declared a State of Emergency, and the Borough expressed, through its emergency proclamations, an intention to maintain law and order through certain restrictions, including traffic diversions.  Additionally, Plaintiff does not cite any legal authority to support the position that a municipality requires express authorization to impose traffic restrictions.  Thus, Plaintiff's argument is rejected.

It is undisputed that Plaintiff was subjected to a "seizure," within the meaning of the Fourth Amendment, when he was at the checkpoint, and that Plaintiff was stopped without individualized suspicion.  See United States v. Pollard, 326 F.3d 397, 410 (3d Cir. 2003); see also United States v. Hartwell, 436 F.3d 174, 177 (3d Cir. 2006).  Thus, the question before this Court is whether Defendants were excused from having individualized suspicion in order to detain Plaintiff at the checkpoint.  See Pollard, 326 F.3d at 410.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons… against unreasonable searches and seizures."  U.S. Const. amend. IV.  "The touchstone of Fourth Amendment analysis is reasonableness."  Pollard, 326 F.3d at 410; see United States v. Ortiz, 422 U.S. 891, 895 (1975).  While "searches and seizures undertaken without a warrant and probable cause or reasonable suspicion are unreasonable," courts have recognized limited exceptions to the general rule, including certain suspicionless searches at checkpoints.  Pollard, 326 F.3d at 410-11; see Hartwell, 436 F.3d at 178-79.  For instance, the Supreme Court upheld the constitutionality of a sobriety checkpoint, established along a state road, at which police officers stopped every vehicle in order to question the driver and look for signs of intoxication. See Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 451-55 (1990).  The Supreme Court has similarly held that "a vehicle may be stopped at a fixed checkpoint [away from the border with Mexico] for brief questioning of its occupants [as to whether the vehicle contained any illegal aliens] even though there is no reason to believe the particular vehicle contains illegal aliens."  United States v. Martinez-Fuerte, 428 U.S. 543, 545 (1976).

Although Plaintiff acknowledges that courts have "permit[ed] some temporary check points and roadblocks for certain specific reasons," he argues that "research reveals no recognized exception that could possibly apply to the instant set of facts."  Pl.'s Br. in Supp. of

Cross-Motion at p. 9-10. However, a checkpoint may be constitutional even though "there is no case law on point." Pollard, 326 F.3d at 411. Instead, to determine whether a checkpoint is reasonable, courts must "apply a balancing test to the facts presented." Id. The Third Circuit has specifically held that "[s]uspicionless checkpoint searches are permissible under the Fourth Amendment when a court finds a favorable balance between the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Hartwell, 436 F.3d at 178-79 (internal quotation marks and citations omitted). "Where the balance tilts in favor of the government," the court must consider the suspicionless search to be reasonable. Pollard, 326 F.3d at 411.

Since the parties have not presented any legal authority on point, i.e., cases in which a municipality established a checkpoint, in response to a severe storm, to verify the residence of persons attempting to enter the municipality such that the police officers could maintain law and order within its territorial boundaries, the Court must balance the facts and circumstances in this case to determine whether the checkpoint was reasonable. See Pollard, 326 F.3d at 411.

With respect to the severity of the interference with individual liberty, checkpoints "intrude to a limited extent on a motorists' right to free passage without interruption… and arguably on their right to personal security." Martinez-Fuerte, 428 U.S. at 557-58 (internal quotation marks and citation omitted). However, similar to the checkpoint stops in both Martinez-Fuerte and Sitz, where the Supreme Court found the checkpoints to be constitutional, Plaintiff was only briefly detained, and "[n]either the vehicle nor its occupants [were] searched, and visual inspection of the vehicle [was] limited to what can be seen without a search."[8] Id. at

---

[8] Tellingly, the checkpoint at issue only operated for a finite period of time. Once the power had been restored to the Borough, and the State of Emergency dissolved, the Department disbanded the checkpoint.

558; see Sitz, 496 U.S. at 451 (stating that "the measure of the intrusion on motorists stopped briefly at sobriety checkpoints... is slight."). Officer Palmer testified that, at the checkpoint, he and other officers asked the occupants of the vehicle for identification, such as a driver's license, but explained that officers allowed individuals to enter the Borough with "a sewer bill, water bill, tax bill that had your name and address in Spring Lake on it…." Palmer Dep. at 33:17-34:1. Furthermore, it is clear that at least some of the officers allowed individuals, including Plaintiff, to enter the Borough without the required paperwork, so long as they provided the officer with a reasonable explanation. Murphy Dep. at 49:1-17, 56:18-22. Plaintiff testified that he traveled through the checkpoint on approximately 18 to 21 occasions. Id. at 38:1-7. In total, the Court concludes that, at the checkpoint, the interference with Plaintiff's individual liberty was relatively minor.

Balancing that slight intrusion with the public interest in imposing the checkpoint, the Court finds that, when considering the unique circumstances caused by the storm, there was a strong interest in maintaining the health, safety and welfare of its citizens, as well as preserving law and order. The checkpoint at issue was established after Hurricane Sandy made landfall, "caus[ing] widespread and severe damage and destruction in New Jersey." Gilliam v. Liberty Mut. Fire Ins. Co., No. 14-361, 2014 U.S. Dist. LEXIS 184510, at *2 (D.N.J. Sept. 25, 2014). It is undisputed that, at the time, the Governor had declared a State of Emergency. Courts have concluded that, during a state of emergency, governmental entities may impose more onerous restrictions upon its citizens, as long as such restrictions are reasonably necessary for the preservation of order. See United States v. Chalk, 441 F.2d 1277, 1280-81 (4th Cir. 1971); see also Moorhead v. Farrelly, 723 F. Supp. 1109, 1113 (D.V.I. 1989). Although not directly analogous, courts have upheld the constitutionality of nighttime, citywide curfews as necessary

to preserve order in a state of emergency.[9]  See id.  For example, the court in Moorhead concluded that the imposition of a curfew was permissible, since it was imposed "at a time of grave emergency; the aftermath of Hurricane Hugo," which caused severe damage and power outages, and that "[t]he curfew was enacted [] to curtail looting and further damage to persons and property."  Moorhead, 723 F. Supp. at 1113.

In the instant matter, Hurricane Sandy had strewn debris and sand across the roadways in Spring Lake, as well as caused significant damage to the boardwalk along the beach.  Palmer Dep. at 32:25-33:6.  In addition to physical damage, the storm caused ongoing electrical power outages in the Borough, which continued through the date that Plaintiff was arrested.  Murphy Dep. at 69:22-24.  Officer Palmer testified that the Department was fearful of looting, and the corresponding property damage, because "there was talk about people looting in surrounding town."  Palmer Dep. at 32:25-33:6.  Based on those circumstances, the Borough and/or the Department decided to implement a proactive approach in an area of great public concern, i.e., public safety, and it implemented certain traffic restrictions, which served a legitimate public interest in preventing persons from driving down roadways that may not be safe, and keeping the roadways clear for emergency personnel and maintenance crews.  In addition, the checkpoint arguably helped isolate the Borough from looting and destruction of property that had been reported in other adjacent municipalities.  Weighing those concerns with the slight intrusion on Plaintiff's liberty, I find that this case tilts in favor of Defendants.  See Pollard, 326 F.3d at 411.  Accordingly, the Court holds that the suspicionless search performed on Plaintiff at the

---

[9] Plaintiff does not challenge the Borough's implementation of a curfew.

checkpoint was reasonable, given the extenuating circumstances, and that Officer Palmer is entitled to qualified immunity in regard to the claim for an unlawful stop in the Second Count.[10]

## 2.    **The Arrest**

In his Complaint, Plaintiff asserts a claim against Officer Palmer for "unreasonable arrest and detention" under the Fourth and Fourteenth Amendment, which this Court construes as a claim for false arrest, since Plaintiff claims that he was unlawfully arrested without probable cause.[11]  Defendant contends that Officer Palmer acted reasonably, and that he properly decided to issue Plaintiff a citation for breach of peace.  Defendants argue that, when Plaintiff refused to provide his driver's license and attempted to retreat, Officer Palmer decided to arrest Plaintiff for obstruction of justice under N.J.S.A. § 2C:29-1.

In analyzing the qualified immunity defense on a false arrest claim, the court must determine whether the plaintiff has established a deprivation of a constitutional right.  See Noble v. City of Camden, 112 F. Supp. 3d 208, 229-30 (D.N.J. 2015).  To state a claim for false arrest, a plaintiff must establish: "(1) that there was an arrest; and (2) that the arrest was made without probable cause."  James v. City of Wilkes-Barre, 700 F.3d 675, 680 (3d Cir. 2012); see Pollock v. City of Philadelphia, 403 Fed. Appx. 664, 669 (3d Cir. 2010); O'Connor v. City of

---

[10] Nonetheless, assuming that the checkpoint was not reasonable, the Court finds that the right to be free from such a checkpoint was not clearly established at the time Plaintiff was stopped.  See Reichle, 132 S. Ct. at 2093; see Coles, 162 F. Supp. 3d at 399-400.  Indeed, both parties agree that there is no case on point that addresses whether a municipality may implement a checkpoint in an effort to maintain the welfare of its citizens and to prevent against looting and destruction.  Thus, Plaintiff cannot maintain that Defendants should have known that their actions were impermissible.  See Harlow, 457 U.S. at 818.

[11] Notably, Plaintiff does not assert a false imprisonment claim under Section 1983, nor does Plaintiff argue that he was falsely imprisoned in his briefing.  Rather, he only asserts a false imprisonment claim under New Jersey state law.

Philadelphia, 233 Fed. Appx. 161, 164 (3d Cir. 2007). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Devenpeck v. Alford, 543 U.S. 146, 153 (2004); see United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002) ("Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested."). The Third Circuit has explained that courts must apply a "common sense approach" and that a determination as to probable cause must be based on "the totality of the circumstances." Paff v. Kaltenbach, 204 F.3d 425, 436 (3d Cir. 2000). Stated differently, "a defendant officer violates an individual's Fourth Amendment right to be free from false arrest if it was not objectively reasonable for the officer to believe that probable cause existed at the time of the arrest." Noble, 112 F. Supp. 3d at 230.

Here, while he was arrested for obstruction of justice, under N.J.S.A. § 2C:29-1(a), Plaintiff contends that Officer Palmer should never have asked for his identification, since the officer lacked probable cause to issue a citation for breach of peace under the municipal ordinance. In that regard, Plaintiff argues that he can curse at Officer Palmer without breaching the peace. Plaintiff is correct in his assertion that, under the First Amendment, a person can direct curse words at a police officer without fear of reprisal. See Johnson v. Campbell, 332 F.3d 199, 213 (3d Cir. 2003); see also City of Houston v. Hill, 482 U.S. 451, 461 (1987). However, there is no evidence in the record that Officer Palmer intended to issue a citation because Plaintiff was cursing at the officer. Instead, Officer Palmer testified that he decided to issue a citation, under the breach of peace ordinance, because Plaintiff was loudly shouting obscenities

within the presence of Streppone and other persons in the neighborhood.  <u>See</u> Palmer Dep. at 14:7-15:5, 19:18-25.

The Spring Lake ordinance for breach of peace reads: "No person shall make, aid or assist in making any disturbance, riot or breach of the peace in the streets or elsewhere within the limits of this Borough."  Although no court has addressed the specific ordinance at issue, New Jersey courts have advised that a person commits breach of peace when he speaks loudly in a public place, and that his words are of such a nature "to be likely, in the light of the gender and age of the listener and the setting of the utterance, to affect the sensibilities of a hearer."  <u>State v. Profaci</u>, 56 N.J. 346, 353 (1970).  In the instant matter, it is undisputed that Plaintiff was loudly cursing in a public place, and that Streppone heard Plaintiff "yelling for no apparent reason."  Streppone Dep. at 43:8-18.  While it is unknown whether such course language actually affected the hearer's sensibilities, that finding is irrelevant.  Rather, Officer Palmer had probable cause to cite Plaintiff under the breach of peace ordinance, since it is reasonable that Officer Palmer believed that Streppone, as well as others in the neighborhood, could have been offended.  <u>See</u> <u>Wright v. City of Philadelphia</u>, 409 F.3d 595, 602 (3d Cir. 2005) (stating that "the evidentiary standard for probable cause is significantly lower than the standard which is required for conviction.");  <u>see</u> <u>Devenpeck</u>, 543 U.S. at 153.  Because Officer Palmer had probable cause to

issue a citation for beach of peace, the question then becomes whether Officer Palmer had probable cause to arrest Plaintiff for obstruction of justice.[12] James, 700 F.3d at 680.

Under N.J.S.A. § 2C:29-1(a), the offense of obstruction of justice is committed when one "purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act." As a preliminary matter, Officer Palmer was authorized to arrest Plaintiff without a warrant as long as the offense occurred in his presence. See Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."); see also State v. Dangerfield, 171 N.J. 446, 460 (2002) (concluding that N.J.S.A. § 40A:14-152 permits officers to perform warrantless arrests for "disorderly and petty disorderly persons offenses that occurred in their presence"). Here, it is clear that Officer Palmer personally witnessed Plaintiff: (i) refuse to provide his identification to the officer, and (ii) walk into the backyard and attempt to enter his father's residence after being instructed that Plaintiff was under arrest.

---

[12] Plaintiff was ultimately charged with: (i) a disorderly conduct charge under N.J.S.A. § 2C:33-2(a)(2); and (ii) an obstruction of justice charge under N.J.S.A. § 2C:29-1(a). At his deposition, Plaintiff testified that the charges against him were dismissed. To be clear, "[t]he validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." Michigan v. DeFillippo, 443 U.S. 31, 36 (1979); see Johnson, 332 F.3d at 211. Rather, the operative inquiry "is whether, looking at the totality of the circumstances at the time of the arrest, the objective facts available to the officers... were sufficient to justify a reasonable belief that an offense was being committed." Johnson, 332 F.3d at 211 (alteration in original) (internal quotation marks and citation omitted).

First, a person obstructs justice by failing to provide a police officer with his identification, including a driver's license, upon request.  See Dawson v. Twp. of Ocean, No. 09-6274, 2012 WL 1964543, at *4 (D.N.J. May 30, 2012) (dismissing the plaintiff's claim for false arrest, since "a reasonable person would believe that [the plaintiff] was guilty of obstructing justice" because he did not produce his identification when asked repeatedly by the police officer); see also State v. Perlstein, 206 N.J. Super. 246, 253 (App. Div. 1985) (concluding that a person's refusal to produce his driver's license constituted obstruction of justice).  In the instant matter, Officer Palmer asked Plaintiff for his driver's license, since he was going to issue a citation for breach of peace, but Plaintiff refused.  Palmer Dep. at 14:7-15:5.  Officer Palmer asked Plaintiff for his driver's license on numerous occasions, but Plaintiff allegedly stated "fuck you, no, I am not giving it to you."  Id. at 21:10-25.  Similarly, Officers, Reiff, Smith and Bowen witnessed Plaintiff refuse to provide Officer Palmer with his driver's license.  See Reiff Dep. at 17:9-18:1; Smith Dep. at 9:10-10:1; Bowen Dep. at 8:1-9:2.  Finally, Plaintiff does not dispute that he refused to produce his driver's license; rather, Plaintiff stated that he decided to walk to the back of the residence.  See Murphy Dep. at 70:13-16, 71:18-21.  Therefore, Officer Palmer had probable cause to arrest Plaintiff for obstruction of justice, pursuant to state law.

In addition, a person commits an obstruction of justice when he attempts to retreat to a place of safety.  See Panarello v. City of Vineland, 160 F. Supp. 3d 734, 753 (D.N.J. 2016) (holding that the defendant's "moving away from the officer, even if not running away, still provides the necessary probable cause to believe that obstruction has occurred."); see also United States v. Santana, 427 U.S. 38, 42 (1976) ("The only remaining question is whether [the defendant's] act of retreating into her house could thwart an otherwise proper arrest.  We hold that it could not.").  It is undisputed that, after Officer Palmer informed Plaintiff that he was

under arrest, Plaintiff attempted to retreat into his father's residence. Palmer Dep. at 15:6-16; see Bowen Dep. at 8:18-9:2. Indeed, Plaintiff stated that he knew he was under arrest, but he proceeded to open the backdoor. Murphy Dep. at 70:13-16, 71:18-21. Thus, Defendants have provided substantial grounds for Officer Palmer to have concluded that he had legitimate justification to arrest Plaintiff for obstruction of justice. Accordingly, qualified immunity is appropriate because Officer Palmer had probable cause to arrest Plaintiff for obstruction of justice, pursuant to N.J.S.A. § 2C:29-1(a).

### 3. Excessive Force

Defendants argue that Officer Palmer decided to effectuate the arrest when Plaintiff attempted to flee into the residence, and that the Officers only used the force necessary to subdue Plaintiff, since he refused to present his arms to be handcuffed. However, other than conclusorily stating that he was subjected to an "unlawful beating," Plaintiff does not advance any substantive arguments in response Defendants' contention that the Officers are entitled to qualified immunity on the excessive force claim. This excessive force claim arises from the manner in which Plaintiff was taken to the ground and subdued during the arrest.[13]

---

[13] Although he does not assert any argument in support of his excessive force claim, Plaintiff claimed, at his deposition, that he sustained various injuries as a result of being arrested, including a broken nose, rib and foot. See Murphy Dep. at 93:24-98:12. However, Plaintiff does not attach any medical records to his opposition to Defendants' motions or his cross-motion for partial summary judgment. Therefore, Plaintiff has failed to meet his burden of proof that he actually sustained injuries. See Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 922 (9th Cir. 2001) (dismissing the excessive force claim, in part, because the claim of injury was "unsupported as [the plaintiff did] not provide any medical records to support her claim that she suffered injury as a result of [the force used]."); see also LaFrenier v. Kinirey, 478 F. Supp. 2d 126, 139 (D. Mass. 2007) (dismissing the excessive force claim, since "allegations of injury, unsupported by medical records or other evidence, are insufficient to avoid summary judgment.").

In excessive force cases, courts in this circuit determine whether a constitutional violation has occurred using the Fourth Amendment's objective reasonableness test as set forth in Graham v. Connor, 490 U.S. 386, 395 (1989). See Curley v. Klem, 499 F.3d 199, 206-07 (3d Cir. 2007). To determine objective reasonableness, courts must balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal quotation marks and citation omitted). While the objective reasonableness inquiry is individualized and fact specific, courts must consider three factors: "(1) the severity of the crime at issue, (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, and (3) whether the suspect attempts to resist arrest or flee the scene." Santini, 795 F.3d at 417 (quoting Graham, 490 U.S. at 396). Other relevant factors include "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997). Finally, objective reasonableness is evaluated "from the perspective of the officer at the time of the incident and not with the benefit of hindsight," and court must employ a "totality of the circumstances" approach. Santini, 795 F.3d at 417 (citing Curley, 499 F.3d at 207).

Even viewing the evidence in the light most favorable to Plaintiff, there is sufficient evidence from which a factfinder could reasonably conclude that the Officers' use of force during the arrest was objectively reasonable under the circumstances. Thomas v. City of Erie, 236 Fed. Appx. 772, 776 (3d Cir. 2007). Addressing the Graham factors, the crimes at issue were not particularly severe. Officer Palmer initially intended to issue a citation to Plaintiff for

beach of peace because he was shouting obscenities in a public place, but Plaintiff was subsequently arrested for obstruction of justice, since he failed to produce his identification when asked repeatedly by Officer Palmer. Although his crimes were not necessarily severe, Plaintiff was belligerent and noncompliant. Instead of complying with Officer Palmer's commands, Plaintiff decided to walk into the backyard of his father's residence, which was completely dark because of the power outages caused by Hurricane Sandy. The Officers proceeded to follow Plaintiff into the dark backyard, where they confronted Plaintiff attempting to enter the residence. Plaintiff admitted that Officer Palmer said he was under arrest, but he still attempted to retreat into the residence to avoid being arrested. At that point, it was unclear whether Plaintiff posed an imminent threat to the safety of the Officers. Officer Palmer specifically stated, "I don't know what is inside of that house. I wasn't going to let [Plaintiff] go in there and let the situation end up in the house where there [are]… possibly weapons…." Murphy Dep. at 23:22-24:2.

Turning now to the additional <u>Sharrar</u> factors, there is no evidence in the record to suggest that Plaintiff was armed, but it is reasonable that the Officers thought that Plaintiff might pose a threat, especially since Plaintiff was screaming and repeatedly shoving his finger into Officer Palmer's face. The circumstances were tense and rapidly escalating. Although the Officers only had to contend with one person, Plaintiff acted uncooperatively throughout his interaction with Officer Palmer at his father's residence, as well as during the arrest. Nevertheless, the Officers only used force while effectuating the arrest, specifically in the context of the takedown maneuver and handcuffing of Plaintiff. Finally, according to Plaintiff, the use of force lasted approximately one minute, which is a relatively short period of time, but

the majority of the time was spent attempting to free his arms from underneath his body, so the Officers could place Plaintiff in handcuffs.

While there is a dispute whether Plaintiff actively resisted arrest by failing to present his arms to the Officers for handcuffing, or whether Plaintiff was not physically capable of presenting his arms, that does not change the fact that the Officers were allowed to use some force when effectuating the arrest. The Supreme Court has explained that effectuating an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396; see Ference v. Twp. of Hamilton, 538 F. Supp. 2d 785, 809 (D.N.J. 2008) (holding that some physical contact, alone, is insufficient to show excessive force because "[w]ere it otherwise, police officers might have to rely on verbal instructions alone to effect an arrest for fear of section 1983 liability"). Stated differently, not every push, shove or grab constitutes excessive force. See Graham, 490 U.S. at 396; see also Cruz v. City of Wilmington, 814 F. Supp. 405, 413 (D. Del. 1993) (holding that, where a suspect repeated failed to follow the officers' directions, the alleged conduct of the officers in pulling him from the car and twisting his arm in order to handcuff him was not excessive force). Furthermore, the force used against Plaintiff in this case pales in comparison to other cases in which courts have determined the use of force to be excessive. See, e.g., Rivas v. City of Passaic, 365 F.3d 181, 198-200 (concluding that beating a suspect who was in the midst of a seizure constitutes excessive force); Green v. New Jersey State Police, 246 Fed. Appx. 158, 161-62 (3d Cir. 2007) (holding that an officer used excessive force when he "violently grabbed" the suspect's neck and struck "him on the head twice with a flashlight."). Based on the totality of the circumstances, and in light of both the Graham and Sharrar factors, this Court concludes that the Officers have

demonstrated that the force used to arrest Plaintiff was objectively reasonable, and thus, the Officers are entitled to qualified immunity and summary judgment on the First Count.

### 4. <u>Conspiracy</u>

Defendants contend that the claim for conspiracy should also be dismissed, since Plaintiff has failed to present any evidence that the Officers entered into a meeting of the minds to violate his constitutional rights. To demonstrate conspiracy under Section 1983, "a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of her constitutional rights under the color or law." <u>Parkway Garage, Inc. v. City of Philadelphia</u>, 5 F.3d 685, 700 (3d Cir. 1993), <u>overruled on other grounds</u>, <u>UA Theater Circuit v. Twp. of Warrington</u>, 316 F.3d 392 (3d Cir. 2003). Critically, a plaintiff must present evidence that there is "a meeting of the minds" to violate a plaintiff's rights. <u>Startzell v. City of Philadelphia</u>, 533 F.3d 183, 205 (3d Cir. 2008) (internal quotation marks and citation omitted); <u>see</u> <u>Estate of Martin v. U.S. Marshals Serv. Agents</u>, 649 Fed. Appx. 239, 244 (3d Cir. 2016). In order to satisfy this requirement, "[a] plaintiff must rely on more than his or her own suspicion and speculation...." <u>Estate of Martin</u>, 649 Fed. Appx. at 244. Here, Plaintiff has failed to point to any evidence that the Officers entered into a "meeting of the minds." In fact, Plaintiff does not even advance any suspicion or speculation as to how the Officers conspired to violate his rights. More importantly, however, this Court has already determined that Plaintiff has not shown an actual deprivation of any federally protected rights, thus his conspiracy claim under Section 1983 must fail. <u>See</u> <u>Perano v. Twp. of Tilden</u>, 423 Fed. Appx. 234, 239 (3d Cir. 2011) (stating that "a § 1983 conspiracy claim only arises when there has been an actual deprivation of a right.").

### b. Claims against the Department

While it is unclear, it appears that Plaintiff also asserts federal constitutional claims against the Department. For example, in connection with his claim for excessive force, Plaintiff alleges that "[t]he use of excessive force was used by the collective Defendants in accordance with and pursuant to a custom or policy." Pl.'s Compl., ¶ 24. Nonetheless, the claims against the Department must fail for two separate reasons.

First, Plaintiff was required to assert his municipal liability claims against the Borough, not the Department. See Monell, 436 U.S. at 690-94. It is well settled that, "[u]nlike unincorporated police departments, municipalities are legal entities amenable to suit for their unconstitutional policies or customs." Padilla v. Twp. of Cherry Hill, 110 Fed. Appx. 272, 278 (3d Cir. 2004); see Fitzgerald v. Kother, No. 15-7773, 2017 U.S. Dist. LEXIS 1897, at *7 (D.N.J. Jan. 6, 2017) (internal quotation marks and citation omitted) ("Police departments cannot be sued in § 1983 actions because the police department is merely an administrative arm of the local municipality, and is not a separate judicial entity."). Accordingly, the Department is not a proper party.

Second, assuming that Plaintiff was allowed to assert his municipal liability claims against the Department, those claims must be dismissed because this Court has already determined that the Officers did not violate his constitutional rights. See Grazier v. City of Philadelphia, 328 F.3d 120, 124 (3d Cir. 2003) (alteration in original) (citation omitted) ("There cannot be an 'award of damages against a municipal corporation based on the actions of… its officer when in face… the officer[s] inflicted no constitutional harm.'"); see also Breakwell v. Allegheny County Department of Human Servs., 406 Fed. Appx. 593, 600 (3d Cir. 2010) (holding that, "[a]bsent any constitutional violation, the Breakwell's Monell claim against Allegheny County necessarily fails."); Marable v. West Pottsgrove Twp., 176 Fed. Appx. 275,

283 (3d Cir. 2006) (stating that "a municipality may not incur <u>Monell</u> liability as a result of the actions of its officers when its officers have inflicted no constitutional injury."). Accordingly, Plaintiff's municipal liability claims against the Department must be dismissed.

**c.     The State Law Claims**

With the dismissal of the federal constitutional claims, the remaining claims are as follows: (i) malicious prosecution under New Jersey common law (Fourth Count); (ii) false imprisonment under New Jersey common law (Fifth Count); (iii) assault and battery under New Jersey common law (Sixth Count); and (iv) negligence under New Jersey common law (Seventh Count). Although Plaintiff seeks partial summary judgment on his malicious prosecution claim, he does not make any arguments in regard to his other state law claims. Indeed, the contours of those claims remain unclear.

Under 28 U.S.C.S. § 1367, a district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C.S. § 1367(c)(3). The Third Circuit has recognized that, when all federal claims are disposed of on a motion for summary judgment, "the district court must decline to decide the pendent state claims" unless extraordinary circumstances exist. <u>Borough of West Mifflin v. Lancaster</u>, 45 F.3d 780, 788 (3d Cir. 1995); <u>see</u> <u>Tully v. Mott Supermarkets, Inc.</u>, 540 F.2d 187, 196 (3d Cir. 1976) (stating that "court[s] should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances."); <u>Simmerman v. Corino</u>, 804 F. Supp. 644, 658 (D.N.J. 1992) ("[W]here a party's federal claims are disposed of on a summary judgment motion, the court should generally refrain from exercising supplemental jurisdiction over the remaining state claims."), <u>aff'd</u>, 16 F.3d 405 (3d Cir. 1993).

In the instant matter, while the Court is cognizant that this case was filed approximately two and a half years ago, the remaining claims are purely state law based, and the Court finds that it is best left to the state court to decide those claims.  Therefore, the Court declines to exercise supplemental jurisdiction.  See Growth Horizons, Inc. v. Delaware County, Pennsylvania, 983 F.2d 1277, 1284-1285 (3d Cir. 1993).  Accordingly, the state law claims are dismissed without prejudice and the statute of limitations tolled, and Plaintiff may refile his remaining state law claims in State court within thirty (30) days from the date of the Order accompanying this Opinion, pursuant to 28 U.S.C.S. § 1367(c)-(d).

## IV.    CONCLUSION

For the reasons set forth above, Defendants' respective motions for summary judgment are **GRANTED**, and the First Count (excessive force), Second Count (false arrest) and Third Court (conspiracy to violate Plaintiff's constitutional rights) are dismissed as to all Defendants. Plaintiff's cross-motion for partial summary judgment is **DENIED**.  In addition, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.  Thus, those claims are dismissed without prejudice and the applicable statutes of limitations are tolled; Plaintiffs may refile his state law claims in State court within thirty (30) days from the date of the Order accompanying this Opinion.  See 28 U.S.C.S. § 1367(c)-(d).


DATE: May 31, 2017                              /s/ Freda L. Wolfson
                                                The Honorable Freda L. Wolfson
                                                United States District Judge